## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## TRENTON DIVISION

| | |
|---|---|
| **KIMBERLY DUNCAN**, <br> 337 Cedar St. <br> South Amboy, NJ 08879 <br><br> Plaintiff, <br><br> v. <br><br> **WELLS FARGO BANK, N.A.**, <br> 420 Montgomery Street <br> San Francisco, CA 94104 <br><br> Defendant. | Case No. 3:19-cv-00172-BRM-TJB <br><br> **FIRST AMENDED COMPLAINT** <br><br> **(Jury demand endorsed hereon)** |

Plaintiff Kimberly Duncan, through counsel, for her First Amended Complaint against Defendant Wells Fargo Bank, N.A., states:

### PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff Kimberly Duncan ("Plaintiff" or "Duncan") was the owner of residential real property, located at and commonly known as 13 Country Woods Lane, Pine Beach, New Jersey 08721 (the "Property") which she occupied as her primary, principal residence until the Property was sold through a short sale.

2.      Duncan is a natural person residing in Middlesex County, New Jersey at her residence of 337 Cedar St., South Amboy, NJ 08879.

3.      From approximately November 22, 2011, to February 25, 2014, Defendant Wells Fargo Bank, N.A. ("Defendant" or "Wells Fargo") was the servicer of a note executed by Duncan (the "Note") and of a mortgage on the Property that secures said note (the "Mortgage") (collectively, the "Loan"). The Mortgage is attached as **Exhibit 1.**

4.      Wells Fargo is an incorporated business under the laws of the State of Delaware that maintains its principal place of business at 101 N. Phillips Ave., Sioux Falls, SD 57104.

5.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) as the matter in controversy as more fully detailed throughout the Complaint exceeds $75,000.00 exclusive of damages sought of a punitive nature and/or interest and costs, and is between citizens of different States.

6.      This Court has supplemental jurisdiction to hear all state law statutory and common law claims pursuant to 28 U.S.C. § 1367.

7.      Venue lies in this District pursuant to 28 U.S.C. § 1391(b) as a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

8.      Duncan has a private right of action under the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1, *et seq.* (the "CFA"), and such action provides for actual damages, treble damages, reasonable attorneys' fees, filing fees, and reasonable costs of suit. N.J.S.A. § 56:8-19.

## FACTUAL BACKGROUND

### Wells Fargo Fails to Adequately Test Its Automated Decision-Making Tool Over a Period of at Least 8 Years

9.      The Home Affordable Modification Program (HAMP) was designed to provide the very help that Plaintiff needed. Introduced pursuant to the Emergency Economic Stabilization Act of 2008, HAMP required mortgage servicers to offer loan modifications to borrowers who met certain threshold requirements. These modifications would lower a borrower's mortgage payments to a manageable level (typically 31 percent of the borrower's monthly income) and allow the borrower to avoid foreclosure.

10.     Similar threshold requirements were incorporated into the mortgage modification requirements of government-sponsored enterprises (or GSEs), such as Fannie Mae and Freddie Mac, and the Federal Housing Administration (FHA).

11.     Duncan met the threshold requirements for a mortgage modification as her mortgage servicer, Wells Fargo Bank, was required to offer her a loan modification. Wells Fargo failed to do so, however, and instead foreclosed on Duncan who could not make her monthly payments without a modification.

12.     Wells Fargo's problem goes much deeper than a single miscalculation, however, and reflects the same type of extreme and outrageous conduct that has embroiled Wells Fargo in a string of public scandals.

13.     Between 2010 and 2018, Wells Fargo failed to detect multiple systematic errors in its automated decision-making tool. This software determined customers' eligibility for a government-mandated mortgage modification during a time of extreme financial distress. Its importance to these customers' lives cannot be overstated. Yet Wells Fargo not only failed to verify that its software was correctly calculating whether customers met threshold requirements for a mortgage modification, it failed to regularly and properly audit the software for compliance with government requirements—allowing life-changing errors to remain uncorrected for years on end.

14.     Wells Fargo was not required to develop its own tool to calculate whether its customers were eligible for government-mandated mortgage modifications. The government provided a free software tool for mortgage servicers to use in determining whether homeowners

met threshold requirements. If Wells Fargo was not going to properly verify and audit its own software, it could have—and should have—used the free software instead.

15.     As a result of Wells Fargo's deficient auditing and compliance procedures, the Bank repeatedly violated HAMP and other government requirements over a period of at least eight years and denied Duncan's modification that the Bank was legally required to offer.

16.     Wells Fargo failed to use appropriate auditing and compliance procedures even after a 2010 investigation by the Office of Comptroller of the Currency (OCC) found numerous deficiencies in the Bank's mortgage modification and foreclosure practices.

17.     The OCC found, among other things, that the Bank had failed to devote adequate oversight to its foreclosure processes, failed to ensure compliance with applicable laws, and failed to adequately audit its foreclosure procedures.

18.     Wells Fargo agreed to correct these deficiencies in two 2011 consent orders, one of which was signed by the Bank's Board of Directors (all of whom were also officers and/or directors of Wells Fargo & Company ("WFC")), and the other of which was signed by WFC pursuant to a resolution passed by WFC's Board of Directors.

19.     Wells Fargo pledged in the 2011 consent orders to maintain adequate governance and controls to ensure compliance with HAMP; to engage in ongoing testing for compliance with HAMP; and to ensure that the Bank's mortgage modification and foreclosure practices were regularly reviewed and any deficiencies promptly detected and remedied. The Bank also promised to maintain a Compliance Committee of board members to monitor its ongoing compliance with the Consent Order.

20.    Wells Fargo subsequently reported to the Federal Reserve that the Bank's Compliance Committee was meeting as required, that the Audit & Examination Committee of WFC's Board of Directors would also assume ongoing responsibility for oversight and compliance based on improved reporting, and that WFC's Chief Operational Risk Officer (CORO) was providing both the Compliance Committee and the Audit & Examination Committee with the necessary information and testing results for them to effectively oversee the Bank's mortgage modification and foreclosure practices and ensure compliance with HAMP and other government requirements.

21.    In one of the consent orders, the Federal Reserve specifically ordered the WFC's Board of Directors to take steps to ensure the Bank complied with its obligations under the consent orders, including by strengthening the Board's oversight of compliance with HAMP and other government requirements; to ensure that audit and compliance programs were adequately staffed; and to improve the information and reports that would be regularly reviewed by WFC's Board of Directors.

22.    Together, Wells Fargo's executives and board members—in particular, Wells Fargo's Compliance Committee, Chief Operational Risk Officer, and Audit & Examination Committee—were supposed to make sure that the Bank conducted the necessary testing to detect and remedy any violations of HAMP and other government requirements. They repeatedly failed to fulfill these obligations over the course of several years, however—in violation of the promises they made in the 2011 Consent Order and in callous disregard of the well-being of their customers.

23.     Four years after Wells Fargo agreed to the terms of the 2011 consent orders, in June 2015, the OCC found that the Bank was still in continuing noncompliance. Among other things, the OCC found that Wells Fargo had not maintained ongoing testing for compliance with HAMP and other government requirements; had not ensured that the Bank's audit and compliance programs had the requisite authority and status within Wells Fargo so that deficiencies in the Bank's mortgage modification and foreclosure practices would be identified and promptly remedied; and had not ensured that the Bank was making reasonable good faith efforts, consistent with HAMP and other government requirements, to modify delinquent mortgage loans and prevent foreclosures of its customers' homes.

24.     In response to Wells Fargo's ongoing violations of the 2011 Consent Order, the OCC prohibited the Bank from growing its residential mortgage servicing business until Wells Fargo brought its operations into compliance with an amended consent order. The OCC also stated that it would be taking additional action against Wells Fargo, the nature and severity of which would depend on the nature, length, and severity of the Bank's continued noncompliance with the amended consent order.

25.     As a result of Wells Fargo's continuing failure to implement adequate auditing and compliance procedures, Wells Fargo failed to catch an error in its mortgage modification software that led the Bank to wrongly deny mortgage modifications to 184 customers between March 2013 and October 2014. The OCC specifically noted this error in its May 24, 2016 order requiring Wells Fargo to pay a civil money penalty of $70 million.

26.     Unbeknownst to the OCC, Wells Fargo had discovered another error in its mortgage modification software in October 2015—one of the errors at issue in this case—which

caused the Bank to wrongly deny mortgage modifications to 625 customers. Well Fargo decided not to tell anybody it had discovered this error—likely as part of an effort to avoid a larger penalty from the OCC and ensure that the OCC would terminate its supervision of the Bank under the 2011 Consent Order and lift the business restrictions it had imposed in 2015.

27.     The Bank's seven-member Board of Directors signed the stipulation under which the Bank accepted the $70 million penalty and acknowledged the error that led the Bank to wrongly deny mortgage modifications to 184 customers in 2013-2014. These directors did not disclose that the Bank had discovered another error—either because their oversight was so non-existent that they did not know, or because they chose to deliberately mislead the OCC to minimize the Bank's penalty and ensure that the OCC lifted the business restrictions it had imposed on the Bank.

28.     To make matters worse, even after discovering the 2015 error, Wells Fargo still did not reform its auditing and verification practices. Related errors that would affect an additional 145 customers were not discovered until three years later.

29.     The failure of Wells Fargo's executives and board members to implement adequate auditing and compliance procedures was not an accident. As scandal after scandal comes to light, it has become all too clear that Wells Fargo's leaders intentionally abandoned their oversight responsibilities—and did so to a shocking degree.

30.     Just as it did in the 2011 Consent Order, Wells Fargo often promised to reform its central oversight as part of its settlements with the government. Each time, Wells Fargo's Board and executives failed to live up to those promises and continued to abdicate their oversight responsibilities. As the OCC stated in April 2018, "Since at least 2011, the Bank has failed to

implement and maintain a compliance risk management program commensurate with the Bank's size, complexity and risk profile," which has "caused the Bank to engage in reckless unsafe or unsound practices and violations of law.

31.     Wells Fargo's persistent failure to implement adequate auditing and compliance procedures has grown so flagrant and resulted in so many consumer abuses that, in February 2018, the Federal Reserve Board announced that it would prohibit Wells Fargo from expanding its business until it sufficiently improves its governance and controls.

32.     In its Cease and Desist Order to Wells Fargo, the Federal Reserve Board found that Wells Fargo had pursued a business strategy that emphasized sales and growth without ensuring that senior management had maintained an adequate risk management framework, which resulted in weak compliance practices.

33.     Wells Fargo was ordered to submit a plan for reforming Board oversight and governance, including steps that it will take to hold senior management accountable, maintain a management structure that promotes effective oversight and compliance control, and ensure the comprehensive reporting necessary for the Board to oversee the firm's execution of its compliance control program.

34.     Wells Fargo was also ordered to submit a plan for reforming its firm-wide compliance program, which must include effective testing and validation measures for compliance with applicable laws.

35.     Until Wells Fargo's plans for reform are approved by the Federal Reserve and the implementation of those reforms pass independent review by a third-party auditor, Wells Fargo is subject to an asset cap that restricts the company from growing larger. 63. As one banking

expert told the New York Times, Wells Fargo "is lucky it is too big to shut down." "A smaller bank might have lost its banking licenses."

36.     A few months after the Federal Reserve's 2018 Cease and Desist Order, and facing the prospect of review by a third-party auditor, Wells Fargo finally disclosed the 2015 error—first to its shareholders in its Q2 2018 Form 10-Q and then to the customers who were denied mortgage modifications, many of whom lost their homes as a result of the error. Wells Fargo wrote in its 10-Q that approximately 625 customers were incorrectly denied a loan modification between April 12, 2010, and October 20, 2015 (when the error was corrected), and that approximately 400 of those instances resulted in a foreclosure. Wells Fargo also wrote that it had "accrued $8 million to remediate customers," which amounts to an average of only $12,800 per customer.

37.     Three months later, in its next Form 10-Q, Wells Fargo disclosed that it had discovered related errors that affected approximately 245 more customers who were incorrectly denied a mortgage modification between March 15, 2010, and April 30, 2018, when Wells Fargo says that "new controls were implemented." These related errors raised the number of affected customers to approximately 870 and the resulting wrongful foreclosures to approximately 545.

38.     Wells Fargo's long-overdue review of its automated mortgage modification software is apparently still not complete. In its recently filed 10-K Annual Report, Wells Fargo disclosed to shareholders that the "effort to identify other instances in which customers may have experienced harm is ongoing, and it is possible that we may identify other areas of potential concern.

## Kimberly Duncan's Experience

39.    On or around August 2011, Duncan began experiencing financial difficulties stemming from a prior divorce and the economic strains caused by the recession and, like millions of other Americans during that time frame, she defaulted on the Loan.

40.    Over the course of the next two years, Duncan sought a loan modification from Wells Fargo.

41.    Meanwhile, on August 10, 2012, with the application still pending, Wells Fargo filed a foreclosure action in the Ocean County Superior Court, Case No. F-015994-12 (the "Foreclosure Case"). The Foreclosure Case Docket is attached as *Exhibit 2*.

42.    On July 26, 2013, Wells Fargo made the decision to deny Duncan's second request for a loan modification due to a computer glitch.

43.    Shortly after, Wells Fargo told Duncan she did not qualify for a loan modification and advised her to give up her house through a short sale instead. Duncan, relying in Wells Fargo's representation, began pursuing a short sale.

44.    Duncan advised Wells Fargo she had secured a buyer for the Property - her neighbor's daughter - without the use of a real estate agent. However, Wells Fargo told Duncan she was required to use a real estate agent to complete the sale.

45.    In February 2014, Duncan sold the Property through a short sale. The Notice of Short Sale Approval and the HUD-1 Settlement Statement are attached as *Exhibit 3*.

46.    Duncan incurred nearly Twenty Four Thousand Dollars ($24,000.00) in settlement charges at closing including Twenty One Thousand Dollars ($21,000.00) for the forced used of a real estate agent. *See Exhibit 3*.

47.     On or about August 3, 2018, Wells Fargo filed a Form 10-Q with the United States Securities and Exchange Commission. The Form 10-Q is attached as ***Exhibit 4***.

48.     The Form 10-Q identified a:

> [C]alculation error that affected certain accounts that were in the foreclosure process between April 13, 2010, and October 20, 2015, when the error was corrected … [a]s a result of this error, approximately 625 customers were incorrectly denied a loan modification or were not otherwise offered a modification in cases where they would have otherwise qualified. In approximately 400 of these instances … a foreclosure was completed.

*See Exhibit 4*.

49.     On or about September 12, 2018, Wells Fargo sent correspondence to Duncan (the "WF Letter") with the subject: "We made a mistake when we reviewed you for payment assistance." The WF Letter is attached as ***Exhibit 5***.

50.     The WF Letter admits that "Wells Fargo Home Mortgage is a division of Wells Fargo Bank, N.A." *See Exhibit 5*.

51.     The WF Letter states:

> We have some difficult news to share. When you were considered for a loan modification, you weren't approved, and now we realize that you should have been. We based our decision on a faulty calculation, and we're sorry. **If it had been correct, you would have been approved for a trial modification.**
>
> **We want to make things right.**

*See Exhibit 5* (emphasis added).

52.     Through the WF Letter, Wells Fargo provided Duncan with a check in the amount of Fifteen Thousand Dollars ($15,000.00).

53.     The WF Letter states that if Duncan feels that Wells Fargo has not "made things right" she could consider mediation and still cash the check. *See Exhibit 5*.

54.     As Duncan did not feel that Wells Fargo "made things right", on or about September 25, 2018, she filled out the mediation form (the "Mediation Request Form"). The Mediation Request Form is attached as ***Exhibit 6***.

55.     The Mediation Request Form stipulates that Duncan is "not waiving any legal claims by participating in the process." *See Exhibit 6*.

56.     Duncan supplemented the Mediation Request Form to explain how Wells Fargo's "faulty calculation" affected her life (the "Explanation Letter"). The Explanation Letter is attached as ***Exhibit 7***.

57.     In the Explanation Letter, Duncan explains that she spent two unproductive years in loss mitigation. Duncan submitted to Wells Fargo all the documents it requested and jumped through every hoop put in front of her. *See Exhibit 7*.

58.     On or about October 11, 2018, Wells Fargo sent correspondence to Duncan (the "Resolution Letter") with the subject: "We've resolved your request, and your payment is enclosed." The Resolution Letter is attached as ***Exhibit 8***.

59.     Through the Resolution Letter, Wells Fargo provided Duncan with a check in the amount of Thirty Two Thousand Five Hundred Dollars ($32,500.00).

60.     Wells Fargo seemingly considered the request for mediation, as it provided Duncan with an additional check. However, as expressed by Duncan in the Mediation Request Form and the Explanation Letter, the amounts contained in Wells Fargo's checks failed to make things right. *See Exhibit 6* and *Exhibit 7*.

12

61.     As Wells Fargo failed to "make things right", Duncan retained DannLaw to file the current matter against Wells Fargo for violations of the CFA, the covenant of good faith and fair dealing, and common law fraud based upon the wrongful denial of the loss mitigation application and concealment of the calculation error for nearly three (3) years, all to Duncan's great prejudice and damage.

62.     Wells Fargo's conduct directly and proximately caused the following damages to Duncan:

A.     Wells Fargo took away the opportunity for Duncan to obtain a permanent loan modification and remain in the Property;

B.     Wells Fargo forced Duncan to spend $21,000.00 on a real estate agent when Duncan had already secured a buyer;

C.     The Property's value has increased by approximately $50,000.00 since the forced short sale. Wells Fargo took away the opportunity for Duncan to realize this equity; a copy of the Zillow valuation is attached as *Exhibit 9*;

D.     Duncan had to retain legal counsel to file this complaint which would have never been needed had Wells Fargo correctly offered Duncan a trial modification or met Duncan's demands in mediation;

E.     Duncan suffered extreme emotional distress, resulting from:

    a.     The unproductive and repetitive loss mitigation process;

    b.     The wrongful denial of her loss mitigation application due to the "faulty calculation" error;

    c.     The continuance of the foreclosure before and after the "faulty calculation" error;

    d.     The loss of the home that her four children grew up in; and,

    e.     Having no other option but to move to a virtually uninhabitable apartment for two years as the foreclosure and delays in reviewing her loss mitigation application destroyed her credit.

F.     Duncan sought medical treatment for panic attacks resulting from the lasting effect of the emotional trepidation caused by Wells Fargo;

G.     Duncan hoped and believed that by entering into a trial modification and a permanent modification of the Loan that she would be able to immediately begin the long process of improving her credit standing.

a.   Wells Fargo reported Duncan to the Credit Reporting Agencies as delinquent on the Loan leaving her unable to obtain credit or insurance at reasonable rates.

b.   Some of Duncan's credit cards were canceled or the available limits were lowered.

c.   Although Wells Fargo stated it would reach out to the Credit Reporting Agencies to remove any negative reporting, it waited years to correct the damage (even apparently after it knew it had made a mistake by not approving her for a trial modification). *See Exhibit 5.*

## COUNT ONE
## VIOLATION OF N.J.S.A § 56:8-2, THE CONSUMER FRAUD ACT (CFA)

63.   Duncan restates and incorporates all of her statements and allegations contained in paragraphs 1 through 62, in their entirety, as if fully rewritten herein.

64.   Wells Fargo is a "person" as defined by N.J.S.A. § 56:8-1(d) because Wells Fargo is a partnership, corporation, company, trust, business entity, or business association.

65.   The CFA prohibits:

The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate...

N.J.S.A. § 56:8-2.

66.   In the operation of its business, Wells Fargo engaged in the use of unlawful practices through its conduct relating to Duncan's loss mitigation review and aggressively pursuing foreclosure against her.

67.   The CFA applies to mortgage servicing generally and to unconscionable business practices with regard to modification of mortgage loans.

14

68.     Despite Duncan having complied with all the obligations as required by Wells Fargo's loss mitigation process and otherwise qualifying for a trial modification, Wells Fargo misrepresented to Duncan that she had not qualified for the trial modification, when in fact she had qualified for the trial modification program which would have allowed her to remain in the property. *See Exhibit 5.*

69.     As a result of this deception, misrepresentation and unconscionable business practice, Wells Fargo continued with the foreclosure action.

70.     Wells Fargo admits that but for its error, Duncan "would have been approved for a trial modification." *See Exhibit 5.*

71.     Wells Fargo's affirmative misrepresentation in 2013 about Duncan not qualifying for a loan modification constitutes an unlawful practice under the CFA.

72.     Wells Fargo discovered the existence of the "faulty calculation" as early as October 20, 2015, but knowingly concealed or omitted this information from Duncan, the other impacted borrowers, and its shareholders until nearly three years later.

73.     These acts in concealing the "faulty calculation" constitute unlawful acts in violation of the CFA.

74.     Wells Fargo admits the "faulty calculation" error began in April 23, 2010, yet the error was still affecting customers three years later during the time of Duncan's loan modification review. Wells Fargo's failure to fix the "faulty calculation" during this 3-year period constitute an unconscionable commercial practice in violation of the CFA.

75.     In the operation of its business, Wells Fargo has engaged in the use of unconscionable, deceptive, and/or fraudulent commercial practices through its conduct in failing

to provide complete information to borrowers who request information about the "faulty calculation" or information specific to their individual loan.

76.     Each unconscionable practice, false promise, misrepresentation, and/or knowing omission of material fact by Wells Fargo described, *supra*, constitutes a separate violation under the CFA.

77.     Wells Fargo's conduct has caused Duncan to suffer ascertainable losses, as plead, *supra*, at ¶ 62.

**COUNT TWO**
**VIOLATION OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**

78.     Duncan restates and incorporates all of her statements and allegations contained in paragraphs 1 through 62, in their entirety, as if fully rewritten herein.

79.     Wells Fargo was in privity of contract with Duncan, through the Loan, and as such is obligated by contract and common law to act in good faith and to deal fairly with Duncan. *See Exhibit 1.*

80.     The purpose of the covenant of good faith and fair dealing is to guarantee that the parties remain committed to the intended and agreed upon expectations of the parties in their performance.

81.     Wells Fargo has breached this duty by delaying the loss mitigation process, ultimately denying Duncan the benefit of a trial modification based on a "faulty calculation", and continuing the foreclosure process.

82.     Wells Fargo has acted in bad faith, dishonestly, and with an improper motive to injure the rights of Duncan.

83.     Duncan suffered actual damages, as plead, *supra*, at ¶ 62, that were caused by Wells Fargo's conduct.

## COUNT THREE
## COMMON LAW FRAUD

84.     Duncan restates and incorporates all of her statements and allegations contained in paragraphs 1 through 62, in their entirety, as if fully rewritten herein.

85.     A cause of action for New Jersey common law fraud requires a plaintiff to prove: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages.

86.     Wells Fargo made material misrepresentations of a presently existing or past fact when it misrepresented to Duncan in 2013 that she did not qualify for a loan modification.

87.     Wells Fargo was aware of this faulty calculation since at least October 20, 2015 yet continued to conceal this error from Duncan until discretely disclosing this information in their August 3, 2018 10-Q.

88.     Wells Fargo continues to conceal the details surrounding the "faulty calculation" error and refuses to provide Duncan with more information relating to her loss mitigation denial and how Wells Fargo discovered and corrected the error.

89.     Wells Fargo knew or should have known that the misrepresentations were false, as inferred by its inexplicable conduct in failing to notify Duncan of the "faulty calculation" for nearly three years after the error was corrected.

90.     Wells Fargo intended that Duncan rely on the misrepresentations in order to continue with the Foreclosure Case, push Duncan towards a short sale, and avoid potential legal claims.

91.     Duncan reasonably relied on the misrepresentations because there was no possible way to discover that she was wrongfully denied until Wells Fargo informed her five years later of the "faulty calculation".

92.     Duncan suffered actual damages, as plead, *supra*, at ¶ 62, that were caused by Wells Fargo's conduct.

93.     The damage to Duncan was foreseeable because Wells Fargo knew Duncan would lose her home after Wells Fargo improperly denied Duncan a loan modification. Wells Fargo was simultaneously pursuing a foreclosure and reviewing Duncan's eligibility for a loan modification.

94.     As Wells Fargo's conduct was willfully and wantonly reckless or malicious, Duncan is entitled to punitive damages.

## COUNT FOUR:
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

95.     Duncan restates and incorporates all of her statements and allegations contained in paragraphs 1 through 62, in their entirety, as if fully rewritten herein.

96.     Wells Fargo engaged in extreme and outrageous conduct as alleged herein. Wells Fargo repeatedly failed to properly verify or audit mortgage modification software on which its customers' homes and wellbeing depended. It allowed systemic errors to persist for five to eight years; ignored consent decrees requiring it to reform its mortgage modification and foreclosure practices; failed to reform its verification and auditing practices even after the government found

18

a software error had led the Bank to wrongfully deny mortgage modifications; concealed its discovery of an additional software error from regulators and customers; and failed to identify other related errors for an additional three years.

97.     The same extreme and outrageous conduct that caused a series of scandals and consumer abuses within Wells Fargo—leading the government to impose billions of dollars in fines and to forbid Wells Fargo from growing until reforms were implemented—was also responsible for Duncan losing her home here. Wells Fargo's Board and executive leadership abandoned their oversight responsibilities to a shocking degree, repeatedly ignoring compliance failures, government fines, and consent decrees requiring leadership to implement appropriate auditing and compliance procedures.

98.     With regard to the Bank's mortgage modification and foreclosure processes in particular, Wells Fargo's Board and executive leadership repeatedly failed to ensure the Bank conducted the necessary testing and audits to detect and promptly remedy any violations of HAMP or other government requirements. Wells Fargo's leadership ignored its oversight responsibilities even after the government found it had not adequately overseen the Bank's mortgage modification and foreclosure operations, even after it agreed to implement proper oversight as part of two 2011 consent orders, and even after the government found in 2015 that Wells Fargo had continuously failed to comply with the consent. Leadership so flagrantly and repeatedly disregarded its oversight responsibilities that the Federal Reserve imposed an asset-restriction on Wells Fargo, under which it will be prohibited from growing unless and until it reforms its oversight and governance.

99.     Wells Fargo acted with reckless disregard for the probability that its conduct would cause emotional distress to Duncan who was wrongfully denied mortgage modifications and foreclosed upon.

100.    As a direct and proximate result of Wells Fargo's conduct, Duncan has suffered both monetary losses and emotional distress as plead, *supra*, at ¶ 62.

101.    Duncan's emotional distress was so severe that no reasonable person could be expected to endure it.

102.    The damage to Duncan was foreseeable because Wells Fargo knew Duncan would lose her home after Wells Fargo improperly denied Duncan a loan modification. Wells Fargo was simultaneously pursuing a foreclosure and reviewing Duncan's eligibility for a loan modification.

103.    As Wells Fargo's conduct was willfully and wantonly reckless or malicious, Duncan is entitled to punitive damages.

<u>COUNT FIVE:</u>
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

104.    Duncan restates and incorporates all of her statements and allegations contained in paragraphs 1 through 62, in their entirety, as if fully rewritten herein.

105.    Wells Fargo owed a duty to exercise reasonable care in evaluating Duncan's eligibility for a loan modification because Wells Fargo undertook to review Duncan's mortgage loan for a loan modification.

106.    Wells Fargo breached that duty by negligently misrepresenting that Duncan did not qualify for a trial modification and continuing the foreclosure process.

107.    As a direct and proximate cause of Wells Fargo's breach, Duncan has suffered monetary losses and emotional distress that resulted in substantial bodily injury or sickness, as plead, *supra*, at ¶ 62.

108.    The damage to Duncan was foreseeable because Wells Fargo knew Duncan would lose her home after Wells Fargo improperly denied Duncan a loan modification. Wells Fargo was simultaneously pursuing a foreclosure and reviewing Duncan's eligibility for a loan modification.

**COUNT SIX:**
**NEGLIGENCE**

109.    Duncan restates and incorporates all of her statements and allegations contained in paragraphs 1 through 62, in their entirety, as if fully rewritten herein.

110.    Wells Fargo owed a duty to exercise reasonable care in evaluating Duncan's eligibility for a loan modification because Wells Fargo undertook to review Duncan's mortgage loan for a loan modification.

111.    Wells Fargo breached that duty by negligently misrepresenting that Duncan did not qualify for a trial modification and continuing the foreclosure process.

112.    As a direct and proximate result of Wells Fargo's conduct, Duncan has suffered both monetary losses and emotional distress as plead, *supra*, at ¶ 62.

113.    The damage to Duncan was foreseeable because Wells Fargo knew Duncan would lose her home after Wells Fargo improperly denied Duncan a loan modification. Wells Fargo was simultaneously pursuing a foreclosure and reviewing Duncan's eligibility for a loan modification.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff Kimberly Duncan prays that this Court enter its order granting judgment against Defendant Wells Fargo Bank, N.A. for the following:

A.  Actual damages of at least $75,000.00 and in an amount to be determined at trial as to Counts One through Six;

B.  Treble damages as to Count One;

C.  Costs and reasonable attorney fees as to Count One;

D.  Punitive damages as to Counts Three, Four, Five, and Six; and,

E.  Such other relief which this Court may deem appropriate.

Respectfully submitted,

/s/ Javier L. Merino
Javier L. Merino
Dann Law
372 Kinderkamack Road, Suite 5
Westwood, NJ 07675
Phone: 216-373-0539
Fax: 216-373-0536
notices@dannlaw.com

## <u>JURY DEMAND</u>

Duncan hereby requests a trial by jury on all issues, with the maximum number of jurors permitted by law.

<u>/s/ Javier L. Merino</u>
Javier L. Merino
Dann Law